**Deanna BENO, Susan Wiseman, Jody Baker, et al., on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Donna SHALALA, Secretary of the United States Department of Health and Human Services, et al., Defendants.**

**No. Civ. S–92–2135–DFL.**

United States District Court,
E.D. California.

July 1, 1993.

Reversed, —— F.3d ——.

---

Mary Grad, Asst. U.S. Atty., Theodore Garelis, California State Attorney General's Office, Sacramento, CA, Sheila M. Lieber, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendants.

Melinda R. Bird, Clare Pastore, Western Center on Law & Poverty, Los Angeles, CA, for plaintiffs.

## MEMORANDUM OF DECISION AND ORDER

LEVI, District Judge.

On December 1, 1992, the State of California began a five-year experimental project modifying welfare benefits provided under the Aid to Families with Dependent Children ("AFDC") program.[1] The project, known as the Assistance Payments Demonstration Project (the "Demonstration Project" or the "Project"), has two primary components. The first element, central to this order, is the work incentive program, which couples a 1.3% decrease in benefit levels with the waiver of certain federal AFDC rules that limit the amount of income a recipient can earn without a corresponding reduction in benefits. Cal.Welf. & Inst.Code § 11450.-01(b). The second element is a one year residency requirement which limits benefits to an AFDC applicant not residing in California during the prior year to the level of benefits the applicant would have received in the state of prior residence. *Id.* § 11450.-03(a).

The residency component of the Demonstration Project was the subject of prior litigation in this court. *See Green v. Anderson,* 811 F.Supp. 516 (E.D.Cal.1993). By order filed January 28, 1993, the court preliminarily enjoined application of the durational residency requirement in section 11450.03(a) and

---

1. AFDC is a "cooperative federalism" program created by the Social Security Act of 1935. 42 U.S.C. §§ 601–687. AFDC benefits are financed jointly by the federal government and the states. The program is administered by the states under a plan approved by the Secretary of Health and Human Services. *Id.* § 601. States are not required to participate in the AFDC program, but if they do they must provide aid in accordance with federal law. *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985). Subject to certain limitations in federal law, the states have the power to set the standard of need and level of benefits. *King v. Smith,* 392 U.S. 309, 334, 88 S.Ct. 2128, 2142, 20 L.Ed.2d 1118 (1968); *Largo v. Sunn,* 835 F.2d 205, 208 (9th Cir.1987).

the validity of that section is not now at issue.

The work incentive portion of the Demonstration Project does not comply with several requirements of the Social Security Act governing the provision of public assistance benefits. Accordingly, California requested that the Secretary of the United States Department of Health and Human Services approve waivers of those requirements under 42 U.S.C. § 1315(a). On October 28, 1992, the Secretary granted three waivers [2] necessary to implement the work incentive portion of the Demonstration Project: (1) a waiver of certain rules limiting the work hours and earned income of some AFDC recipients; [3] (2) a waiver of the requirement of uniform statewide benefits to permit the State to establish, for research purposes, a control group exempt from the benefit cut and work incentives; and (3) a waiver of the "maintenance of effort" requirement that conditions federal approval of state medicaid plans on the state's maintenance of benefit levels at or above the levels existing on May 1, 1988.[4] The 1.3% benefit cut places AFDC benefits below the May 1988 floor, hence the State's request for waiver of this requirement.

Plaintiffs are California AFDC recipients subject to the grant reduction and residency requirement.[5] They challenge the Demonstration Project's benefit cut and the Secretary's grant of waivers on a number of differ- ent grounds. First, plaintiffs argue that it was arbitrary and capricious of the Secretary to grant waivers for the Demonstration Project because the waivers permit statewide application of the Project when only 10,000 AFDC recipients from four counties will be studied, and because the waivers permit application of the benefit cut to those unable to work. Second, plaintiffs argue that the Demonstration Project and associated waivers violate the safeguards for human research subjects provided in section 211 of the Department of Health and Human Services 1992–1993 Appropriations Act, Pub.L. No. 102–394, 106 Stat. 1792 (1992). Plaintiffs contend that the benefit cut poses a danger to the well-being of AFDC recipients and therefore requires their written, informed consent. Third, plaintiffs argue that the benefit cut and work incentive aspects of the Project discriminate against those disabled AFDC recipients who are unable to work in violation of section 12132 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213 (1991). Finally, plaintiffs contend that the Demonstration Project and waivers violate the requirements for work-related programs specified in 42 U.S.C. § 684(a).[6]

Plaintiffs now move for a preliminary injunction invalidating the waivers necessary to implement the 1.3% benefit cut, and enjoining the State's application of that cut to

**2.** In addition, the Secretary granted a waiver of provisions that forbid the basing of AFDC benefits on length of residency in the state.

**3.** The AFDC rules waived by the Secretary include (1) the "100 hour rule," which prohibits certain AFDC recipients from working more than 100 hours per month, *see* 45 C.F.R. §§ 233.-100(a)(1)(i), 233.100(c)(1)(iii); and (2) the time limits associated with the "thirty dollars and one-third earnings disregard," which serve to restrict an AFDC recipient's ability to retain a portion of earned income without decreasing benefit payments, *see* 45 C.F.R. §§ 233.20(a)(11)(i)(D), 233.-20(a)(11)(ii)(B).

**4.** The Social Security Act prohibits the Secretary from approving a state's Medicare plan if the state has established AFDC welfare payments at levels less than the payment levels in effect on May 1, 1988:

Notwithstanding subsection (b), the Secretary shall not approve any State plan for medical assistance if—(1) the State has in effect, under its plan established under part A of title IV [42 U.S.C. § 601 *et seq.*], payment levels that are less than the payment levels in effect under such plan on May 1, 1988; ...

42 U.S.C. § 1396a(c). Section 1396a(c) is referred to as "the maintenance of effort requirement."

**5.** In an order filed on April 19, 1993, the court certified a plaintiff class defined as "all AFDC recipients subject to AFDC grant reductions or to a residency requirement pursuant to California's Assistance Payments Demonstration Project." The parties stipulated to this class definition.

Approximately 888,000 families currently receive AFDC; all but 5,000 of these families are subject to the 1.3% benefit cut. *See* Pls.' Ex. 13.

**6.** The complaint also alleges that the Project violates 7 U.S.C. § 2017(b) by considering Food Stamp eligibility in establishing reduced AFDC payment levels. This allegation is not at issue in these motions.

AFDC families headed by disabled adults. Plaintiffs also seek to enjoin the expenditure of federal funds on the Project. The Secretary moves to dismiss all claims against her, primarily on the basis that her decisions concerning the Demonstration Project are not subject to judicial review. Both motions were heard on April 9, 1993. For the reasons stated below, the court finds that the Secretary's decision is subject to review but that plaintiffs are not likely to succeed on the merits as to any of their claims.

### I. Review of the Secretary's Waivers

**A. Is the Secretary's Decision Subject to Review?**

The Social Security Act grants discretion to the Secretary to waive certain of the Act's requirements. Under 42 U.S.C. § 1315(a), the Secretary may waive a state's compliance:

> In the case of any experimental, pilot, or demonstration project which, *in the judgment of the Secretary, is likely to assist in promoting the objectives* of ... Part A or D of subchapter IV of this chapter, in a State or States—
>
> (1) the Secretary may waive compliance with any of the requirements of section ... 1396a of this title, as the case may be, *to the extent and for the period he finds necessary* to enable such State or States to carry out such project....

42 U.S.C. § 1315(a) (emphasis added). Plaintiffs claim that the waivers permitting California to implement the Demonstration Project and benefit cut do not comply with the requirements of section 1315(a) and thus may be invalidated as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. In addition to contesting this assertion on its merits, the Secretary argues that her decision to grant waivers is "committed to agency discretion" and so is not subject to judicial review.

■ Sections 701–706 of the APA govern judicial review of agency action. 5 U.S.C. §§ 701–706. Section 702 generally provides a right of review to any person "adversely affected or aggrieved" by agency action. However, "to the extent that an agency action is committed to agency discretion by law," the APA precludes judicial review. 5 U.S.C. § 701(a)(2). The Secretary argues that section 1315 does just this. Because the section is drafted in subjective terms—according to the Secretary's judgment and the Secretary's finding—as opposed to objective criteria, the Secretary is of the view that the decision to grant a waiver is committed to agency discretion and thus unreviewable under the APA. To prevail on this point, the Secretary must overcome the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986).

■ Agency decisionmaking has been found unreviewable under section 701(a)(2) in limited circumstances. An agency's exercise of its discretion not to prosecute or begin enforcement proceedings is unreviewable because such decisions involve "a complicated balancing of a number of factors which are peculiarly within [the agency's expertise]" and because "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (section 701(a)(2) applies in "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply"). An agency's decision as to how to budget funds from a lump-sum appropriation "is another administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil,* — U.S. —, —, 113 S.Ct. 2024, 2031, 124 L.Ed.2d 101 (1993). A lump-sum appropriation evinces a congressional purpose to give the agency maximum flexibility and discretion while the allocation of such resources involves numerous competing demands which the agency is better suited to resolve than the courts. *Id.* 113 S.Ct. at 2031–32. Finally, the decision by the Director of Central Intelligence to terminate an employee is not reviewable under the APA.

*Webster v. Doe,* 486 U.S. 592, 601, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988). This decision, affecting the national security, concerns "an area of executive action 'in which courts have long been hesitant to intrude.'" *Lincoln,* —— U.S. at ——, 113 S.Ct. at 2031 (quoting *Franklin v. Massachusetts,* —— U.S. ——, ——, 112 S.Ct. 2767, 2785, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring in part and concurring in judgment)). Moreover, the particular statutory provision at issue "fairly exudes deference to the Director" by vesting the decision to terminate in the Director's judgment as opposed to some objective standard. *Webster,* 486 U.S. at 600, 108 S.Ct. at 2052 ("[Section] 102(c) allows termination of an Agency employee whenever the Director 'shall deem such termination necessary or advisable in the interest of the United States,' not simply when the dismissal *is* necessary or advisable to those interests."). The *Webster* Court relied as well on the overall structure of the National Security Act, which grants broad authority to the Director of Central Intelligence to assure the confidentiality of agency sources of information and the reliability of its employees. *Id.* at 600–01, 108 S.Ct. at 2052–53.

■ Three overlapping considerations emerge from the cases as central to the decision of whether a matter is committed to the agency's discretion under section 701(a)(2): first, the language of the statutory provision at issue and whether the statute "exudes deference" to the agency's subjective judgment or rather provides objective standards that courts may apply; second, the overall statutory scheme, of which the specific provision is a part, and whether that scheme is consistent with judicial review or

rather bespeaks a congressional will to commit the particular area of decisionmaking to the agency's unreviewable discretion; and third, whether the area of decisionmaking traditionally has been viewed as within the agency's exclusive domain.

■ As applied to section 1315(a), and in light of the presumption of reviewability, these considerations suggest that the Secretary's decision to grant waivers of statutory and regulatory requirements is reviewable under the APA. It is true, as the Secretary emphasizes, that the language of section 1315(a) is drafted in terms of the Secretary's subjective judgment. The section permits a waiver "in the judgment of the Secretary" and "to the extent and for the period [she] finds necessary." But this language by itself is not determinative. *See County of Esmeralda v. U.S. Dep't. of Energy,* 925 F.2d 1216, 1218–19 (9th Cir.1991) (finding reviewable a provision of the Nuclear Waste Policy Act which gives the Energy Secretary discretion to define the units of local government affected by radioactive waste repositories).[7] Moreover, the statute provides standards, law to apply, by providing that the Secretary may grant waivers when "likely to assist in promoting the objectives" of the AFDC program [8] and "to the extent and for the period ... necessary" to enable the state to carry out the project. Thus, although within the Secretary's discretion, the decision to grant a waiver is not entirely open-ended. *Cf. State of Nevada v. Watkins,* 914 F.2d 1545, 1563 (9th Cir.1990).

Further, the structure of the Social Security Act does not suggest that the matter of

---

7. The statute at issue in *Esmeralda* defined "affected unit of local government" as:

> [T]he unit of local government with jurisdiction over the site of a repository or a monitored retrievable storage facility. Such term may, *at the discretion of the Secretary,* include units of local government that are contiguous with such unit.

*Id.* at 1218 (citing 42 U.S.C. § 10101(31)) (emphasis added). The legislative history indicates that the definition is to be based on the Secretary's subjective views. *Id.* at 1218–19.

8. Some of the objectives of the AFDC program are evident in 42 U.S.C. § 601. That section

authorizes the appropriation of federal funds to the AFDC program

> [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance ... as far as practicable under the conditions in each State, to needy dependent children and their parents or relatives ... to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection....

42 U.S.C. § 601.

waivers is committed to the agency's unreviewable discretion or that judicial review would "endanger" that statutory scheme. *See Esmeralda*, 925 F.2d at 1219. Unlike the National Security Act in *Webster*, the provisions of the AFDC program do not reveal a congressional commitment to the unfettered discretion of the Secretary. Rather than confer to the Secretary a general and unspecific mandate to aid dependent children, Congress has instead devised complex and detailed assistance programs which the Secretary is directed to implement. Although it would have been possible for Congress to draft section 1315 in less discretionary terms, nowhere in the AFDC program is there a clear statement or even an implication that such decisions, if discretionary, are not subject to review.

Finally, the granting of an exemption from statutory requirements is not an area of agency discretion traditionally unreviewable. Indeed, it would be somewhat surprising were Congress to grant unreviewable discretion to the Secretary to exempt States from such an all-encompassing series of statutory requirements. Perhaps for this reason, every court that has looked at section 1315 has assumed that the Secretary's waiver decisions are subject to at least limited review. *See Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir.1973); *Crane v. Mathews*, 417 F.Supp. 532 (N.D.Ga.1976); *California Welfare Rights Organization v. Richardson*, 348 F.Supp. 491 (N.D.Cal.1972).[9] One may acknowledge that the Secretary's position is of some force particularly in light of certain of the language in *Webster*. But on a broader view, the relevant considerations suggest that the decision of the Secretary to grant a waiver under section 1315 is not committed to agency discretion by law. The Secretary's motion to dismiss the claim on this basis is denied.

The court now turns to plaintiffs' claim that the Secretary's grant of waivers here violated the APA.

### B. Scope of Review.

■■■ The parties agree that under section 706(2)(A) of the APA the substance of the Secretary's decision to grant the waiver may only be overturned if "arbitrary or capricious." Under this standard, the court must merely "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[10] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). "The court is not empowered to substitute its judgment for that of the agency." *Id.* Review here must be particularly narrow because the terms of the waiver provision in section 1315(a) so emphasize that the decision is discretionary and within the Secretary's judgment. Judicial review is limited to whether the Secretary had a rational basis for making a judgment that the waiver was warranted. *Aguayo*, 473 F.2d at 1105.

■■■ At oral argument, plaintiffs came close to conceding that they would not prevail in a challenge to the substance of the Secretary's decision,[11] and instead focused their argument on a *procedural* review of the Secretary's action.[12] Plaintiffs argue that section 1315 requires the Secretary to make two specific findings: (1) that in the Secretary's judgment the Demonstration Project

---

**9.** These cases were decided before *Webster*, but even after *Webster*, courts have found other provisions of the Social Security Act not committed to agency discretion. *See Board of Trustees of Knox County Hosp. v. Sullivan*, 965 F.2d 558 (7th Cir.1992); *Universal Health Serv. of McAllen, Inc. v. Sullivan*, 770 F.Supp. 704 (D.D.C.1991).

**10.** An agency decision may be arbitrary and capricious if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

**11.** Plaintiffs' counsel acknowledged that the court is not required to review the "wisdom" of the Secretary's decision.

**12.** Because this argument was emphasized for the first time at oral argument, it was not extensively briefed by the parties.

was likely to assist in promoting the objectives of the AFDC statute; and (2) that the extent and time period of the waiver was necessary to enable the State to conduct the project. Because neither finding explicitly appears in the administrative record, plaintiffs contend that the waiver must be invalidated and the case remanded to the Secretary to make the required findings.

Plaintiffs' interpretation of section 1315 is in error. The statute nowhere requires the Secretary "to make findings." The statute merely authorizes the Secretary to grant a waiver for a time period and to an extent the Secretary "finds"—in the sense of determines—necessary to carry out the state project. This language is not the equivalent of a requirement to make findings. Similarly, the Secretary must exercise "judgment," but need not make a "finding," to determine that the project is likely to promote the objectives of the Act. In none of the three published cases challenging a Secretary's waiver decision under section 1315 did the court order the Secretary to make formal findings. *See Aguayo*, 473 F.2d at 1103, 1106 (the court acknowledged there was no statement of grounds for the decision in the record before it, but found the papers on which the agency acted sufficient to conduct a review of the decision); *California Welfare Rights Organization*, 348 F.Supp. at 496 (the court discerned on its own, without apparent guidance from the Secretary, the objectives the project and waiver were designed to meet); *Crane*, 417 F.Supp. at 538 (between the first and second hearings on plaintiffs' preliminary injunction motion, the Secretary issued a memorandum setting forth in detail the objectives the project and waiver were designed to achieve; there is no indication the court required the memorandum).

 In the absence of a statutory directive, formal findings are not required under the APA. *Overton Park*, 401 U.S. at 417, 91 S.Ct. at 824.[13] Yet there must exist enough of a record to support the agency action—to show that the agency has considered the relevant factors and to enable the court adequately to review whether the agency's decision was arbitrary or capricious. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985); *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973). If the agency's failure to explain frustrates effective judicial review, "the proper course is to remand to the agency for additional investigation or explanation." *Florida Power*, 470 U.S. at 744, 105 S.Ct. at 1607; *see also Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825.

 While the court may not supply a basis for the agency decision that the agency itself has not given, it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Further, a lower standard of justification is warranted where the statute merely requires the Secretary to make an overall judgment, rather than requiring the Secretary to make specific findings based on prescribed criteria. *See Aguayo*, 473 F.2d at 1103 (it is "legitimate for an administrator to set a lower threshold for persuasion" when required to reach a "judgment" about a project which is merely experimental and of limited duration); *see also Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1107 (9th Cir.1989) (Secretary of Agriculture has discretion to impose different conditions on two timber sale contracts and the Secretary need not provide an explanation where "it is manifest" that the contracts are qualitatively different).

 In the circumstances of this case, no remand is necessary because the record before the court is adequate for judicial review. The situation is similar to that in *Aguayo;* the Secretary has not explicitly presented the grounds for the waiver decision, yet the materials before the Secretary at the time of the decision, as well as the Secretary's approval letter, suffice to examine whether the

---

13. Under *Overton Park*, formal findings are only required (1) if the statute so directs, (2) if the Secretary's action involves rulemaking or adjudication under 5 U.S.C. §§ 553 & 554, or (3) if the nature of the agency action is ambiguous. *Overton Park*, 401 U.S. at 417, 91 S.Ct. at 824. None of these situations is present here.

Secretary failed to "consider the relevant factors" or made a "clear error in judgment." [14] Specifically, the record includes: (1) the Secretary's October 29, 1992 approval of the project, including a letter to California officials, a list of waivers granted, and detailed "Terms and Conditions" of the waiver approval, see Pls.' Ex. 4; (2) California's waiver request dated September 17, 1992, which includes a statement of the objectives and hypotheses of the research project, see Pls.' Ex. 3; and (3) comments by the Western Center on Law and Poverty, plaintiffs' lead counsel in this suit, objecting to numerous aspects of the Demonstration Project. As discussed in the following section, these materials are sufficient to determine if the Secretary considered the relevant factors and made a clear error in judgment.

### C. *Validity of the Waivers*

■■■ The Secretary's waivers are arbitrary and capricious if inconsistent with the standards for waivers provided in section 1315. There is no dispute that as to the first component of the waiver statute—whether the project "is likely to assist in promoting the objectives" of the AFDC program—the Secretary's decision to grant waivers was reasonable. The goals of the work incentive component were outlined by the State in its waiver request as (1) providing incentives to seek and maintain employment; (2) reducing the attractiveness of welfare; (3) creating an incentive to work while still on aid; (4) increasing the long term earnings potential of AFDC recipients; and (5) removing barriers to full-time and part-time employment. Pls.' Ex. 3 at 8, 12. These goals are consistent with at least one of the objectives of the AFDC statute: "to help ... parents or relatives [of needy dependent children] to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." 42 U.S.C. § 601. That the Secretary considered the Project's likelihood of promoting this objective is evident in the "Terms and Conditions"

accompanying the waiver approval. Condition number 3.11 requires the State to conduct an "impact study" to examine the extent to which the Demonstration Project "help[s] AFDC recipients to achieve self-sufficiency," as well as the effect of the project on "employment rates, length of employment, amount of earned income, and exit and recidivism rates for AFDC and Food Stamps." Pls.Ex. 4, Waiver Terms and Conditions at 7. The Secretary considered the relevant factors and her judgment that the Demonstration Project promotes the objectives of the AFDC statute is not arbitrary or capricious.

■■■ The waiver statute also instructs the Secretary to permit waivers "to the extent and for the period he finds necessary to enable such State ... to carry out such project." Plaintiffs challenge the breadth of the waivers for the work incentive project. They claim that it was arbitrary and capricious for the Secretary to approve statewide waivers when data will only be collected from a handful of counties. This challenge to the Secretary's action fails. As a preliminary matter, the Secretary's decision to approve the research design appears well considered. The detailed "Terms and Conditions" attached to the approval of the waivers demonstrate the Secretary's evaluation of the feasibility and validity of the research design as well as its overall cost-neutrality. See Pls.' Ex. 4, Waiver Terms and Conditions at 2, 4–6, 8–12. Comments submitted by plaintiffs' attorneys specifically raised the objection that the waivers were broader than necessary to accomplish the purpose of the project. See Pls.' Ex.C. These comments, and the Secretary's evident rejection of them, suggest that the agency considered and rejected a narrower research scope. *See Aguayo*, 473 F.2d at 1105–06.

Nor is the breadth of the waivers arbitrary or capricious. As the Secretary notes, the language of section 1315(a) asks the Secretary to determine if a waiver is necessary to accomplish the *State's* project. Since the State designed a five year, statewide project,

---

**14.** In *Aguayo,* the court considered: (1) a memorandum from the Secretary outlining the expected results and objectives of the project; (2) materials submitted by the plaintiffs criticizing the project on numerous grounds; and (3) memoranda submitted by the State identifying the objectives of the project and answering the objections of plaintiffs. *Aguayo,* 473 F.2d at 1105–06.

the Secretary argues that any waiver must be that broad. Even if this argument appears somewhat disingenuous in light of the detailed "Terms and Conditions" attached to the approval, the Secretary surely may grant a broad degree of latitude to the states in the design and scope of experimental projects. Moreover, it is evident from the record that a good deal of thought went into the Secretary's approval of the research design. It is understandable that the State and the Secretary would require that a project providing a benefit cut should be implemented on a state-wide basis for reasons of equity and to avoid the possible movement of AFDC recipients from counties covered by the project to those that were not. The Secretary's determination that statewide waivers were warranted is not a clear error of judgment.

█ Plaintiffs also contend that the Secretary acted arbitrarily or capriciously in granting waivers for the work incentive program because the application of benefit cuts to those of the disabled who are unable to work, and so unable to make up the benefit cut through earnings, violates the ADA. In response, the Secretary argues that the Social Security Act does not exist to enforce the ADA and thus she need not consider potential violations of the ADA when exercising her discretion under the Social Security Act. While the court is unwilling to endorse the view that the Secretary need never consider the requirements imposed by other federal laws in deciding whether to approve a waiver, in the circumstances here it was not arbitrary or capricious to fail to do so. As discussed at length in a later section of this memorandum, the Demonstration Project does not violate the ADA.

For the reasons stated above, the court finds that plaintiffs are not likely to succeed on the merits of their section 1315 claim.

## II. *The Human Subjects Experimentation Claim*

Congress has restricted the ability of the Department of Health and Human Services ("HHS") to expend federal funds on experimental projects which present a danger to the physical, mental or emotional well-being of any human participants:

> None of the funds appropriated by this Act or subsequent ... Appropriation Acts shall be used to pay for any research program or project or any program, project or course which is of an experimental nature, or any other activity involving human participants, which is *determined by the Secretary or a court of competent jurisdiction to present a danger to the physical, mental, or emotional well-being of a participant* or subject of such program, project, or course, *without the written, informed consent of each participant* or subject, or a participant's parents or legal guardian, if such participant or subject is under eighteen years of age. The Secretary shall adopt appropriate regulations respecting this section.

Health and Human Services Appropriations Act, Pub.L. No. 102–394, § 211, 106 Stat. 1792, 1812 (1992) (emphasis added). While first enacted in the Departments of Labor and Health, Education and Welfare ("HEW," the predecessor agency to HHS) Appropriations Act of 1975, Pub.L. No. 93–517, § 412, 88 Stat. 1634, this language has been included in every subsequent HEW and HHS appropriations act. Plaintiffs claim that the Secretary's expenditure of federal funds on the Demonstration Project[15] without obtaining the written, informed consent of all AFDC recipients subject to the benefit cut violates section 211 and constitutes an abuse of discretion.

Defendants move to dismiss this claim on two grounds: (1) that there is no judicial review of a violation of section 211; and (2) that an experiment which merely reduces welfare benefits does not, as a matter of law, present a danger to participants within the meaning of section 211.

### A. *Reviewability*

█ The APA provides a cause of action for review of the Secretary's actions under section 211. There is no dispute that plaintiffs are human participants in a federally-funded "experiment." *See Crane,* 417

---

15. The Secretary's waiver approval for the Demonstration Project provides that the federal government will match the State's administrative costs to implement the program. Pls.' Ex. 4 at 8.

F.Supp. at 546; Federal Defs.' Mot. to Dismiss at 47. As such they are "adversely affected or aggrieved" by a decision not to provide them with informed consent, and "entitled to judicial review" under 5 U.S.C. § 702. *See Doe v. Sullivan*, 938 F.2d 1370, 1382 (D.C.Cir.1991) (finding reviewable under the APA plaintiff's claim that a Food and Drug Administration regulation was invalid because it conflicted with the informed consent requirements of the Department of Defense Authorization Act).

■ The Secretary's argument to the contrary is not persuasive. The Secretary argues as before that because the granting of waivers under section 1315 is, in her view, "committed to agency discretion," so must be a decision under section 211 as to whether the particular program under review amounts to a danger to the participants. But even if section 1315 waivers were committed to agency discretion, the Secretary's actions under section 211 would be independently reviewable. The duties imposed on the Secretary under section 211 are wholly separate and different from those imposed under section 1315. Further, the language of section 211 does not "exude deference" to the agency. *See Webster*, 486 U.S. at 600, 108 S.Ct. at 2052. Although it allows the Secretary discretion to determine when a danger is presented by a project, it provides specific criteria—"danger to physical, mental or emotional well-being"—to guide that discretion and requires the Secretary to issue regulations consistent with the statutory criteria. Finally, far from excluding judicial review, or committing the matter solely to the agency's discretion, Congress expressly provides that the courts may determine whether danger is present within the meaning of the statute.

All of these factors support the conclusion that judicial review of section 211 under the APA is not foreclosed.[16]

### B. *No Danger as a Matter of Law*

■ The Secretary urges dismissal of the section 211 claim because demonstration projects that reduce public assistance benefits do not, "as a matter of law," pose a danger to the physical, mental or emotional well-being of recipients within the meaning of the statute. This interpretation is not supported by the language of the statute, its legislative history, or the Secretary's implementing regulations. *See Alaniz v. Office of Personnel Management*, 728 F.2d 1460 (Fed.Cir.1984) (a position adopted by an agency for the purpose of litigation, when no evidence in the record supports the interpretation, is not due deference). The Secretary acknowledges that the language of section 211 nowhere expressly exempts financial injury from a benefit cut from the definition of "danger." Fed.Defs.' Reply on Mot. to Dismiss at 35–36. Further, when first enacted in the 1975 Appropriations Act, the language in section 211 was intended to apply an existing set of 1974 HEW regulations governing the use of HEW grants and contracts on human subjects research to projects undertaken by HEW itself. *See* 120 Cong.Rec. 31,596–97 (1974) (statement of Sen. Buckley) ("[T]his amendment ... simply establishes in law and somewhat broadens the protection of human subjects of research and experimentation and similar activities which is already a part of HEW regulations ... to include activities carried out by HEW itself."). Those original 1974 regulations protected any individual exposed to the possibility of "social" as well as physical or psychological harm. 38 Fed.Reg. 27,882 (1973). It is not clear that financial

---

**16.** In addition to review under the APA, plaintiffs claim that section 211 creates an implied private right of action allowing aggrieved research subjects to obtain an independent judicial determination of "danger." But even were there a cause of action under section 211, the court would be guided by the Secretary's regulations, and agency interpretations of those regulations, in determining whether there were a "danger" to plaintiffs under the Demonstration Project. For this reason, review under the APA and directly under section 211 will not be materially different and it is not necessary on this motion for preliminary injunction to decide whether a private right of action exists on section 211.

Plaintiffs also claim that 42 U.S.C. § 1983 "creates a vehicle by which plaintiffs can seek redress against the State for violation of the Appropriations Act." Pls.' Opp'n to Mot. to Dismiss at 23. This argument fails because section 211 is directed at the Secretary and imposes no requirement or obligation on the state. *See Suter v. Artist M.*, — U.S. —, — – —, 112 S.Ct. 1360, 1367–68, 118 L.Ed.2d 1 (1992); *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981).

harm was necessarily excluded from those broader regulations.

Finally, HHS has implemented the Appropriations Act directive through its regulations governing human subject research at 45 C.F.R. Part 46. The regulations provide that research involving human subjects conducted, supported or regulated by HHS must comply with two primary safeguards: (1) prior review of the project by an institutional review board (IRB), *see id.* §§ 46.107–.115; and (2) informed consent of research subjects, *see id.* §§ 46.116–.124. Section 46.-101(b)(5)(i) explicitly exempts research involving public benefit programs, including changes in benefit levels, from the safeguards provided in the regulation:

> (b) Unless otherwise required by department or agency heads, research activities in which the only involvement of human subjects will be in one or more of the following categories are exempt from this policy: ... (5) Research and demonstration projects which are conducted by or subject to the approval of department or agency heads, and which are designed to study, evaluate, or otherwise examine:
>
> (i) Public benefit or service programs; (ii) procedures for obtaining benefits or services under those programs; (iii) possible changes in or alternatives to those programs or procedures; or (iv) possible changes in methods or levels of payment for benefits or services under those programs.

However, the regulations provide for discretionary application of safeguards to exempted research:

> (d) Department or agency heads may require that specific research activities or classes of research activities conducted, supported, or otherwise subject to regulation by the department or agency but not otherwise covered by this policy, comply with some or all of the requirements of this policy.

*Id.* § 46.102(d). Thus, the regulations do not provide a blanket exemption for decreases in levels of public benefits. Instead, the regulations provide that as a general rule a project which changes benefit levels will not present a danger such that informed consent is required, but do not foreclose such a finding of danger in any particular case.[17] The motion to dismiss on this basis is denied.

### C. *Validity of Regulations*

In asking the court to overturn the Secretary's implicit finding of no danger, plaintiffs urge that the agency's interpretation of the statute, as expressed in the regulations defining danger, is not entitled to deference. As discussed above, the regulations issued under the statute provide that public benefit projects are generally exempt from the informed consent requirements of section 211 and thus that "danger to physical, mental or emotional well-being" within the meaning of section 211 generally excludes risks created by public benefit research projects, including those which change the level of benefits provided.

Deference is due "to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." *Clarke v. Securities Indus. Assn.,* 479 U.S. 388, 404–05, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987); *see also Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). No deference is appropriate, however, if Congress has directly addressed the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. The court "must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9. If, however, Congress is silent on the issue or congressional intent is ambiguous, the agency's interpretation is up-

---

17. Even the Secretary's 1976 interpretation of the original HEW regulations, cited by the defendants as the strongest statement that the regulations never intended to cover financial injury, is not absolute: "[A] diminution in the level of welfare benefits (*within prescribed boundaries*)

payable to some but not all similarly situated welfare beneficiaries, ... would not constitute burdens or effects of the nature that the regulations are intended to encompass." 41 Fed.Reg. 26,572–73 (1976) (emphasis added).

held if based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. "The court does not simply impose its own construction on the statute" when the agency has issued a reasonable interpretation. *Id.*

The plain language of section 211 and its legislative history do not establish an unambiguous intent to include financial injury from public benefit research within the scope of projects presenting a "danger to the physical, mental or emotional well-being." Terms such as "danger" and "well-being" are not self-defining and Congress recognized as much by providing that the Secretary should issue implementing regulations. The legislative history suggests that the sponsors of section 211 were focused primarily on medical research projects using human subjects. *See* 120 Cong.Rec. 31,596–97 (1974) (statements of Sen. Biden, Sen. Buckley). Surely if Congress intended that any experimental cut to any federally supported public benefit program would require the written informed consent of the recipients, either the statute or the legislative history would explicitly express this position.

 Given that the intent of Congress to include public benefit programs is not clear from the face of the statute, the court must uphold the agency's construction of the statute unless unreasonable, and here the agency's position is not unreasonable. Legitimate reasons for exempting public benefit projects are evident from the record. First, in a 1976 interpretation, the agency explained why the 1974 regulations (upon which section 211 was based) did not apply to protect individuals from potential financial injury posed by a research project: "[C]ausing a lowering of ... income ... would not depart from the normal experiences which other Americans can expect to encounter in their daily lives

and would thus not constitute the type of departure from 'ordinary and accepted methods' to which the regulations were intended to apply; ... [the regulations were] not intended to protect individuals from the 'ordinary risks of daily life.'" 41 Fed.Reg. 26,573 (1976). Second, comments published with regulations proposed in 1982 and promulgated in 1983 express the belief of the agency that public benefit projects are already subjected to substantial review by state and federal officials and that subjecting them to further regulation would be "duplicative and needlessly burdensome," and would result in "unnecessary delays in project implementation." 48 Fed.Reg. 9266 (1983); 47 Fed.Reg. 2278 (1982). Public benefit research involves matters such as eligibility criteria and delivery systems, which are more within the expertise of program officials than a review board. 48 Fed.Reg. 9268 (1983). For these reasons the agency's interpretation of the statute as generally excluding public benefits projects is based on reasonable considerations and is entitled to deference.[18] *See Chevron,* 467 U.S. at 865, 104 S.Ct. at 2793.

D. *Section 211 and the California Demonstration Project*

 Section 211 does not require the Secretary to make a formal finding of no "danger to the physical, mental or emotional well-being of a participant." Thus, the court may uphold the Secretary's decision not to require informed consent of AFDC recipients "if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2867. Here, there is no reference to the section 211 requirement in the Secretary's letter and attachments approving the waiver. However, in their comments submitted to the agency prior to the

---

**18.** Plaintiffs also argue that little deference is due to the Secretary's interpretation because her position has been inconsistent. *See INS v. Cardozo–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) ("[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view"). This argument is without merit. The agency's interpretation of section 211 has been largely consistent over the last twenty years, beginning with the 1976 inter-

pretation at 41 Fed.Reg. 26,572 and continuing to the present version of the regulations at 45 C.F.R. Part 46. In 1981, the agency did promulgate regulations which subjected public benefit experiments as a class to IRB review; but even then the regulations continued to provide discretionary exemptions of public benefit projects from informed consent requirements. 46 Fed. Reg. 8386, 8390 (1981). The general exemption for public benefits projects was reinstated in 1983, and has remained in the regulation since.

waiver approval, counsel for plaintiffs argued that a danger under section 211 did exist for AFDC recipients. Pls.' Ex. C. These comments provide some evidence that the agency considered its obligation under section 211 prior to taking action. *See Aguayo,* 473 F.2d at 1105–06. Further, an explicit determination of no danger is not required by the regulations; the Secretary must only take action if she determines the public benefit exemption should *not* apply. In these circumstances, one fairly may assume that the Secretary found no reason to treat the Demonstration Project as an exception to the general rule. Thus, the Secretary's determination that no danger was presented by the 1.3% benefit cut is discernable from the waiver approval itself and from the materials before the agency at the time of approval.

The Secretary's failure to require informed consent from AFDC recipients subject to the 1.3% benefit cut was not error. Plaintiffs experience a degree of hardship when there is any decrease in benefits. But a 1.3% cut is not so significant as to remove the Demonstration Project from the general exemption of benefits projects from the informed consent requirement.[19] Indeed, this is exactly the type of project at which the public benefits exemption is directed, one involving "changes in ... levels of payment." 45 C.F.R. § 46.101(b)(5)(i). Plaintiffs are not likely to succeed on their section 211 claim.

### III. *Americans With Disabilities Act* [20]

■ Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Implementing regulations, codified at 28 C.F.R. §§ 35.101–35.190, bar the states from excluding qualified disabled [21] persons from the benefits of any service, program or activity. 28 C.F.R. § 35.130(a). The states are required to provide qualified disabled persons with aids, benefits and services that are as effective in affording equal opportunity to obtain the same result, benefit or level of achievement as that provided to others, *see id.* § 35.130(b)(1)(iii), and may not utilize criteria or methods of administration that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of a program with respect to qualified disabled individuals, *see id.* § 35.130(b)(3)(ii).

In addition, the regulations prohibit a public entity from denying equal services, programs or activities to an individual or entity "because of the known disability of [a person] with whom the individual or entity is known to have a relationship or association." *Id.* § 35.130(g). Further, section 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the modifications fundamentally alter the nature of the service.

Plaintiffs argue that the Demonstration Project violates the ADA by cutting the AFDC payments of that subset of disabled

---

**19.** The benefit cut translates to a net loss of seven dollars per month for a family of three. Pls.' Mot. for Prelim.Inj. at 20 n. 37. This loss may be offset by changes to the rules governing earned income.

**20.** This claim is asserted only against the State defendants, and consequently is not a subject of the Secretary's motion to dismiss.

**21.** "Disability" is defined under the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such impairment." 28 C.F.R. § 35.104. "Physical or mental impairment" means (A) "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss" affecting one of a list of major body systems; or (B) "any mental or psychological disorder." *Id.* "Major life activities" means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.*

The ADA prohibits discrimination against *qualified* individuals with disabilities. 42 U.S.C. § 12132. Under the ADA, a "qualified individual with a disability" is one who "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131.

persons who cannot work and therefore cannot take advantage of the benefits of the project's various work incentives.[22] The argument is of some force. It is not disputed that the Demonstration Project was intended to create work incentives for recipients able to work; the effect of the project on those disabled recipients who are unable to work appears unintended and serves no stated goal of the project.[23] It appears harsh to cut the benefits of those who cannot work, and of their dependents, as part of a work incentive experiment. Nonetheless, the Demonstration Project does not violate the ADA.

Plaintiffs do not argue that any cut in social welfare programs violates the ADA, and it would place extraordinary restrictions on the states' ability to design a budget and to fashion and alter welfare programs were this the case. Even so, an across the board cut in benefits undoubtedly falls heaviest on the disabled since they are less able to offset the loss through employment or other adjustment. *Cf. Alexander v. Choate,* 469 U.S. 287, 289, 105 S.Ct. 712, 714, 83 L.Ed.2d 661 (1985) (disproportionate impact on disabled Medicaid recipients of a cut in benefits does not violate the Rehabilitation Act).[24] Nor do plaintiffs attack the work incentives other than the benefit cut provided by the Demon-

stration Project or contend that any work programs or work incentives provided by a state must violate the ADA since some of the disabled may not be eligible for such programs. The benefits of such programs are not available to those unable to work, but the ADA prohibits discrimination only as against qualified individuals with disabilities and one unable to work would not be qualified for such work related programs. *See* 42 U.S.C. § 12131; *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). Thus, had the Demonstration Project only enhanced work incentives, by permitting working AFDC recipients to retain more of their earnings, plaintiffs could not attack the project under the ADA even though the effective income of AFDC recipients, unable to work, would be diminished relative to those recipients able to work.

Plaintiffs suggest that although the State could independently reduce AFDC benefits and enhance work incentives, it may not, under the ADA, do both as part of a single project. It is unclear why the State may not do in one program what it may do in two. The ADA prohibits the State from excluding the qualified disabled from participation in the "benefits of [its] services, programs, or

---

**22.** The work incentive component of California's research project consists of three main elements: (1) waiver of the 100-hour rule which allows parents to work more without jeopardizing their eligibility for benefits; (2) "fill the gap" income retention which, by lowering the Maximum Aid Payment (MAP) by 1.3%, creates a larger gap between the amount of assistance provided and the Minimum Basic Standard of Adequate Care (MBSAC), and every dollar earned to fill the gap may be retained without a loss in benefits; (3) waiver of the time limits on the practice of allowing AFDC recipients to keep a portion of earned income without a loss in benefits.

Plaintiffs expressly state that they are challenging the legality of only one portion of the work incentive experiment—"the grant reduction as a 'work incentive.'" Pls. Reply at 6 n. 4. However, when discussing how the Demonstration Project violates the ADA, plaintiffs include the other components—the waiver of the 100-hour rule and the opportunity to retain more earned income—as part of the *benefit* of the program which is denied the disabled, leaving it unclear as to whether plaintiffs are actually challenging the other aspects of the work incentive experiment as well. *See id.* at 27. At oral argument, however, plaintiffs reiterated that they do not

challenge the State's provision of incentives to foster work among able-bodied welfare recipients, but merely the use of a benefit cut as a work incentive.

**23.** The State's waiver request states: "The intent that AFDC for a family with able-bodied adults be a transitional means of support while recipients are seeking self-sufficiency is not being realized.... The Work Incentive ... [component is] targeted at addressing this issue." Pls.' Ex. 3 at 7–8.

**24.** The parties have not cited and the court has not found any relevant case law interpreting Title II of the ADA, which only recently became effective (on January 26, 1992). However, Title II is expressly modeled after section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794. *See* 42 U.S.C. § 12134; Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services, 28 C.F.R. Part 35 App. A, 429, 438–39 (1992). Cases interpreting the Rehabilitation Act are instructive in interpreting the nearly identical requirements of Title II of the ADA and its implementing regulations. *See id.* at 440.

activities." 42 U.S.C. § 12132. Under the Demonstration Project, disabled AFDC recipients continue to receive AFDC in the same amounts as other recipients. The benefit cut cannot fairly be characterized as a "service, program, or activity," and if it can be, it falls on all recipients alike. If it is the intended enhanced incentive to work that may follow upon a benefit cut which is the "service, program, or activity," no distinction can be drawn between the benefit cut and the other work incentives, such as the more generous rules on retained earnings, which plaintiffs do not attack and which do not violate the ADA. Plaintiffs who are unable to work are not "qualified" persons under the ADA for the benefit of a work incentive, whether that benefit takes the form of a cut to AFDC, or a work training program, or a change in the rules concerning retention of earned income.

■ Certainly the State could exclude from the benefit cut those of the disabled who are unable to work. It would be humane to do so. Whether this would be difficult administratively does not appear from the record now before the court. But the ADA does not require the State to make this accommodation. *Cf. Alexander,* 469 U.S. at 308, 105 S.Ct. at 724 (State need not minimize effect of proposed benefit cut on the disabled).

Here the same benefit—AFDC payments—are offered to the disabled and nondisabled alike. No benefit for which the wholly disabled are qualified is denied to them. Plaintiffs are not likely to succeed on the merits of their claim under the ADA.

### IV. *Section 684 Claim*

■ The Secretary seeks dismissal of plaintiffs' claim that California's work incentive program violates the requirements of the "Job Opportunities and Basic Skills Training Program" in Part F of Title IV of the Social Security Act, codified at 42 U.S.C. §§ 681–687.[25] States participating in the AFDC program must establish and operate a job oppor-

tunities and basic skills training program which must include a number of specified activities and services, such as educational activities, job skills training, job readiness activities, and job development and placement. *Id.* § 682(d)(1)(A)(i). A state may also "offer to participants ... such other education, training, and employment activities as may be determined by the state and allowed by regulations of the Secretary." *Id.* § 682(d)(1)(B)(ii).

Section 684(a) requires that a state, when assigning AFDC recipients to a program activity under Part F, must "assure that ... the conditions of participation are reasonable, taking into account in each case the proficiency of the participant and the child care and other supportive services needs of the participant." *Id.* § 684(a)(4). This requirement applies to "work-related programs and activities under this part, *and any other work-related programs and activities authorized (in connection with the AFDC program) under section 1315." Id.* § 684(e) (emphasis added).

Plaintiffs claim that the 1.3% benefit cut is subject to the requirements of section 684(a)(4) as a "work related program or activity" authorized under the waiver provisions of section 1315. Plaintiffs argue that the benefit cut is "work related" because its purpose is to create a work incentive to "fill the gap" between the maximum benefit payment and the standard of need.

■ Plaintiffs have failed to state a claim under 42 U.S.C. § 684(a).[26] A benefit cut, even when designed to create a work incentive, is not subject to the requirements applicable to "job opportunity and basic skills training program[s]." The purpose of Part F is "to assure that needy families with children obtain the education, training, and employment that will help them avoid long-term welfare dependence." *Id.* § 681. Toward that end, Part F focuses on ensuring that the states offer AFDC recipients tangible education, training and employment services,

---

25. Plaintiffs have not included this claim in their request for preliminary injunctive relief; it is raised only on the Secretary's motion to dismiss.

26. The parties have not briefed, and the court does not address, whether plaintiffs have a cause of action to enforce the requirements of section 684(a) against the State.

and on specifying the conditions under which these services must be provided. *See id.* § 682(d). Further, the requirements set forth in section 684—provisions for workers' compensation and displacement of existing workers, employment grievance procedures, and conditions governing "assignment" of participants to "activities"—are meaningless when applied to a benefit cut. A benefit cut, no matter what its purpose, is not a "program" or "activity" offered by the State to assure that needy families obtain education, training and employment.

Plaintiffs can prove no set of facts in support of this claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The Secretary's motion to dismiss the section 684 claim is granted.

### V. *Conclusion*

For the reasons stated above, the Secretary's motion to dismiss is granted as to the section 684 claim and denied as to the waiver and human subjects experimentation claims.

 To obtain a preliminary injunction, plaintiffs must show "either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in [their] favor." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).[27] As discussed above, plaintiffs are not likely to succeed on the merits of their claim that it was arbitrary and capricious of the Secretary to grant waivers for the Demonstration Project, that the Project and waivers violate the safeguards for human research subjects contained in the HHS Appropriation Act, or that the Project discriminates against disabled AFDC recipients who are unable to work. Even were plaintiffs to raise serious questions regarding these claims, the balance of hardships does not tip sharply in their favor. This benefit cut, while serious for AFDC recipients, is not draconian. Where a motion for preliminary injunctive relief involves public assistance programs, "the public interest

is a factor to be strongly considered." *Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.), *rev'd on other grounds,* 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983). Here, the State has a substantial interest in the continuity of its experiment. The motion for a preliminary injunction is denied.

IT IS SO ORDERED.

---

**27.** These alternative formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987).